UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| REUBEN CORTES, et al., | Case No. 1:18-cv-00001-BLW |
| Plaintiffs, | |
| v. | **ORDER DENYING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT** |
| JOSH TEWALT, et al.,[1] | |
| Defendants. | |

Pending before the Court in this prisoner civil rights class action matter is the Joint Motion for Final Approval of Class Action Settlement filed by the parties, as well as supplemental clarification by the parties and several responses and objections of class members. Dkts. 152, 136–146, 148–151, 153, 259, 162, & 163–165. The Court held a video-conference hearing on May 10, 2022, at 2:00 p.m. Appearing at the hearing were counsel for the Idaho Department of Correction (IDOC) and Corizon, Inc. (Corizon), counsel for inmate Barry Searcy (the former *Balla*[2] attorneys), plaintiff class representative Reuben Cortes, and several current and former inmates.

---

[1] The Court has updated the plaintiff to be the named class representative and the current IDOC director, who has authority to enforce injunctive relief orders.

[2] *See* Balla v. IBOC, No. 1:81-cv-01165-BLW (D. Idaho, prospective injunctive relief terminated May 30, 2020).

**ORDER DENYING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT - 1**

Having reviewed the entirety of the record, the Federal Bureau of Prisons guidelines (versions 2018 and 2021), and numerous federal court civil rights opinions involving prisoner Hepatitis C virus (HCV) treatment, the Court enters the following Order denying final approval of the class action settlement, with the hope that the parties will make adjustments to their agreement and resubmit it in the near future.

## BACKGROUND

1. **Allegations of Complaint and Recent History of IDOC HCV Treatment for Inmates**

In 2016 and 2018, Plaintiffs Philip A. Turney, Billy Ray Bartlett, Michael A. McCall, Reuben J. Cortes, Kenneth Michael Workman, and Ray Marvin Nichols filed several similar actions against IDOC complaining of inadequate and outdated HCV medical treatment for IDOC prisoners. The claims were consolidated into this case. Additional inmates retained counsel and joined the action as individual plaintiffs.

Plaintiffs allege that Defendants relied upon nonmedical reasons to refuse to test, screen, and provide direct-acting antiviral (DAA) treatment for inmates infected with HCV, despite Plaintiffs' requests that the prison modernize its HCV treatment protocol to meet new community medical standards. Plaintiffs assert that "HCV progressively impairs the liver's ability to assist the body in digesting essential nutrients [and] filter toxins from the blood, [] affecting the normality of daily life and activities," and that "[e]very day without treatment, especially for older inmates, increases the likelihood of cirrhosis, fibrosis, liver cancer, the need for a liver transplant, complications from the disease and ultimately death from liver failure due to the HCV infection." Dkt. 102, p. 21.

Beginning in June 2014, the Federal Bureau of Prisons ("BOP"), the Center for Disease Control ("CDC"), the United States Public Health Service ("USPHS"), the Food and Drug Administration ("FDA"), and the United States Department of Veteran Affairs ("VA") all recognized that the HCV medical community had changed its standard HCV treatment protocol from Interferon injections to extremely effective—but extremely expensive—DAA oral medications, including Harvoni. *Id*. The DAA HCV drugs are so effective that they are considered a "cure." As a result, Plaintiffs assert that DAA treatment should be made available not only to inmates in advanced stages of HCV, but also to inmates "who rank low on Defendants' prioritization list and for all practical purposes may never move up on the list to receive treatment (unless they develop cirrhosis or worsening fibrosis) due to the influx of new offenders continually coming into the prison system with a higher priority need." Dkt. 102, p. 21. In other words, Plaintiffs want inmates to be diagnosed, treated, and cured *before* their bodies begin to deteriorate in the more advanced stages of HCV.

The recent history of IDOC's HCV treatment protocol prior to the parties' Settlement Agreement is relevant here. Evidence presented in one of the consolidated cases, 1:16-cv-00309-BLW, *Workman, et al. v. Kempf, et al*. ("Case 309"), shows that, in 2015, IDOC and Corizon met for the purpose of determining how to begin DAA treatment. At that time, a course of Harvoni treatment cost $100,000 per inmate. During 2015, Corizon contributed $200,000 and IDOC contributed $800,000 exclusively for DAA treatment for the 10 sickest HCV inmates. See Dkt. 50-7 in Case 309.

IDOC then worked to find an outside contractor who could obtain the medications at Medicaid pricing, which meant that, in 2017, Harvoni cost $40,000 per inmate. During that time period the IDOC followed the 2016 FBOP guidelines. The IDOC appropriately characterized the FBOP guidelines as recommending that the "sickest" inmates be treated first. Dkt. 50-7, p. 19 in Case 16-309.

In 2016, the IDOC created a log of all inmates who had chronic HCV, using the 2016 FBOP guidelines' prioritization scale of 1 through 4. The IDOC "Hep C Log 5-24-16" showed 51 inmates at Priority 1 and 2 (the sickest inmates); 21 at Priority 3; and 456 at Priority 4. Dkt. 50-8, pp. 2-12 in Case 16-309.

For the Fiscal Year (FY) 2017 budget, the IDOC sought $3.1 million for HCV treatment. That was approved by the legislature. Dkt. 50-7, p. 16. Corizon continued to provide an additional $200,000 per year for HCV treatment. As of July 2017, with the HCV-specific appropriations from the state legislature, the IDOC had treated 61 of its sickest HCV patients. *Id*., p. 19.

In FY 2017, the IDOC did not request funding to treat inmates in FBOP Priority levels 3 and 4. IDOC officials limited their request to funding for treatment of FBOP Priority levels 1 and 2, because they thought that a larger amount of funding was unlikely to be approved. Dkt. 50-7, p. 21 in Case 16-309.

This background shows that the foundation of the parties' Settlement Agreement was already in place in 2017. Statistics showing how many HCV-positive inmates were treated with DAA medications between FY 2018 and FY 2020 are unknown. In 2018, the

**ORDER DENYING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT - 4**

FBOP guidelines changed, adjusting the subcategories of prioritization for treatment of HCV inmates according to the "treat the sickest first" principle.

Jumping to FY 2021, the IDOC agreed in the current Settlement Agreement to seek a legislative allotment of $4.35 million to treat no less than 150 chronic HCV inmates. *See* Dkt. 127-7, ¶ 3.6.1 in this case. That must be viewed in a context (gauged by 2017 numbers) where 528 total inmates had chronic HCV. As soon as six months have passed, a person's HCV status is considered chronic. *Id*., ¶ 1.3.

### 2. Procedural Background of Case

After complaints were filed and actions consolidated, Plaintiffs moved for class action status and a preliminary injunction. Dkts. 54-58. After a case management conference in January 2019, Plaintiffs withdrew their motions and pursued mediation. Dkts. 97-100. With the aid of private mediator Newel K. Squyres, Esq., the parties engaged in alternative dispute resolution proceedings between July 18, 2019, and September 1, 2020. Without admission of liability, the parties reached an amicable resolution of their dispute in this action.

Plaintiffs' operative pleading, the Second Amended Complaint with Supplement, seeks declaratory, injunctive, and monetary relief. Dkt. 111. The named plaintiffs settled their past, present, and future monetary damages claims as individuals, and the claims were dismissed with prejudice. Dkts. 131, 132. The Court next certified a Federal Rule of Civil Procedure 23(b)(3) class, based on predominant common questions of law or fact, for settlement of injunctive and declaratory relief claims only. The limited class was not

certified for settlement of any monetary damages claims of any plaintiff, including class members who are not named plaintiffs.

The plaintiff class is defined as (1) all current and future inmates in IDOC legal and/or physical custody who have not been diagnosed with HCV; (2) all current and future inmates in IDOC legal and/or physical custody who have or will be diagnosed with HCV; and (3) all individual plaintiffs who have been treated with DAA Treatment. *See* Dkt. 127-2.

The parties submitted their Settlement Agreement (Dkt. 127-2), and the Court preliminarily approved it. Dkt. 134. The Settlement Agreement addresses implementation of a new HCV diagnosis and treatment protocol in the IDOC prison system and is intended to settle all declaratory and injunctive relief claims, including associated attorney fees and costs of class counsel.

The parties jointly seek final approval of the Settlement Agreement. The class consists of about 8,000 inmates. Eleven inmates filed objections.

## REVIEW OF SETTLEMENT AGREEMENT TERMS

### 1. Standard of Law for Review

The United States Court of Appeals for the Ninth Circuit has held that there is a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992) (citations omitted). Federal Rule of Civil Procedure 23(e) requires the district court to determine whether a proposed settlement is fundamentally fair, adequate, and reasonable. *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir.1992). It is

the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness. *Officers for Justice v. Civ. Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 628 (9th Cir. 1982). The district court cannot "delete, modify or substitute certain provisions." *Id*. at 630. The settlement must stand or fall in its entirety. *Id*.

## 2. Settlement Agreement Terms Outside the Scope of Certification and Certification Errors

The first substantial objection, presented by Barry Searcy, concerns Settlement Agreement ¶ 3.12.3:

> Plaintiffs release and forever discharge [Defendants] from any and all future claims … including claims for monetary damages, declaratory relief, injunctive relief, and costs whether arising under federal or state law, which are based upon or arise from action and conduct required by and undertaken in compliance with the obligations set forth in this Agreement, and which may arise out of conduct, circumstances and/or events which occur after the Effective Date of this Agreement but prior to July 1, 2028, related to the diagnosis, testing, evaluation, management, monitoring, education, or treatment of inmates with HCV, including treatment with DAA Medications, whether such claims are now known or come to be known in the future.

Searcy's attorneys argue that the parties are not permitted to include a waiver of all class members' future claims for monetary damages because this class action was certified for settlement of injunctive and declaratory relief claims under Fed. R. Civ. P. 23(b)(3). In response, the parties explained at the hearing that, in return for the injunctive relief Plaintiffs obtained, it was only logical that the class agreed to give up the right to

sue Defendants and their successors for *complying* with the Settlement Agreement. Two different issues arise with this objection, which the Court now addresses.

### A.    Three Types of Class Certification with Different Requirements

Before the question of whether a damages claim can be included in a class action certified only for injunctive relief can be answered, the Court must determine whether it is permissible for the parties to mix and match elements of Rule 23(b)(2) and(b)(3), or whether only one subsection governs certification and the Settlement Agreement.

In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3). *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Moreover, Rule 23(e), which specifically sets forth settlement requirements for class actions, is not a stand-alone subsection, as the United States Supreme Court has explained:

> Rule 23(e), on settlement of class actions, reads in its entirety: "A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." This prescription was designed to function as an additional requirement, not a superseding direction, for the "class action" to which Rule 23(e) refers is one qualified for certification under Rule 23(a) and (b).

*Id.* at 620–21.

i.    <u>Subsection (b)(3)</u>

This action was certified under Rule 23(b)(3) (questions of law or fact common to class predominate over individual issues). Inclusion in the class under this subsection is not mandatory and requires that adequate notice be given to all class members informing

them of the opportunity to opt out of the settlement agreement rather than be bound by it. *Ellis v. Costco Wholesale Corp*., 657 F.3d 970, 987 (9th Cir. 2011).

> ii. Subsection (b)(2)

Subsection (b)(2) is applicable where injunctive relief is appropriate as to the class as a whole. The procedural protections of subsection (b)(3) (notice and an opt-out provision) are not elements of (b)(2) certification, because the Rule considers them "unnecessary to a (b)(2) class." *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362 (2011). Classes certified under (b)(2) are mandatory—no opting out is permitted. Notice to class members is not required. As to section (b)(2), certification depends on "the indivisible nature of the injunctive or declaratory remedy." *Wal-Mart Stores*, 131 S. Ct. at 2557 (citation omitted). The "fact that some class members may have suffered no injury or different injuries from the challenged practice does not prevent the class from meeting the requirements of Rule 23(b)(2)." *Rodriguez v. Hayes,* 591 F.3d 1105, 1125 (9th Cir. 2010).

> iii. Subsection (b)(1)(A) or (B)

Subsection (b)(1)(A) provides for class certification when "prosecuting separate actions by or against individual class members would create a risk of … inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." Subsection (b)(1)(B) provides for certification where adjudication of individual claims "would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." Classes certified

under subsection (b)(1) are mandatory, with no opting out and no notice to class members required.

Both of these subsections have been used in prisoner class action cases. For example, in *Hilton v. Wright*, 235 F.R.D. 40 (N.D.N.Y. 2006), the district court certified an inmate HCV action under both 23(b)(1) and (b)(2). The *Hilton* court noted that several other courts had granted certification under subsection (b)(1)(B) where classes of inmates sought injunctive relief. *Id*. at 53 (citing *Ingles v. City of New York*, No. 01 Civ. 8279 (DC), 2003 WL 402565, at *8 (S.D.N.Y. Feb. 20, 2003) (collecting cases)).

    iv.   <u>Analysis</u>

Here, the parties did not request, and the Court did not give, an "opt out" opportunity in the class action member notice of the proposed Settlement Agreement. The parties did not request an opt-out provision because they represented that the subject matter was solely injunctive relief. However, though the Court certified the class under subsection (b)(3), it is subsection (b)(2) that governs actions for injunctive relief with no opt-out provision.

Subsection (b)(3) can be used for injunctive relief requests, with or without monetary damages requests, but that section does not specify that the "opt out" notice may be omitted when only injunctive relief is at issue. In *Ellis*, the court noted that, after *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), it is clear that notice and "opt out" provisions are required in a (b)(3) action, regardless of the type of relief addressed:

> The absence of these protections [notice and opting out] in a class action predominantly for monetary damages violates due process. *Phillips Petroleum Co. v. Shutts*, 472

**ORDER DENYING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT - 10**

U.S. 797, 812, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). The *Wal–Mart* court later opined: "We fail to see why the Rule should be read to nullify these protections whenever a plaintiff class, at its option, combines its monetary claims with a request—even a 'predominating request'—for an injunction." 131 S.Ct. at 2559.

657 F.3d at 987. Subsection 23(e)(4), which governs class settlements, bolsters the interpretation that an opt-out opportunity for 23(b)(3) class members is mandatory (regardless of the relief agreed upon in the settlement), because it specifies that a court may omit a *second* opportunity to opt out once a settlement agreement is pending before the court, but it does not specify that the court may give *no* opt-out opportunity.

In the context of ¶ 3.12.3, the opt-out provision becomes especially important because class members are being asked to give up all future claims for monetary damages, and certain class members may not desire to do so. For example, as the Court more fully explains below, under the current Settlement Agreement, inmates who are in the lower risk subcategories of chronic HCV may never get treatment unless they develop life-threatening symptoms. If an inmate falls into that subcategory, he would receive no benefit from the Settlement Agreement and would actually be harmed by it if he could not sue to obtain treatment.

The good news is that making changes in certification of a class is permitted. A "district court's order respecting class certification is 'inherently tentative' prior to final judgment on the merits." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 633 (9th Cir. 1982); *see also* Fed.R.Civ.P. 23(c)(1)(C). If a court determines that a class was not properly certified or that the certification no longer fits the circumstances, it may

ORDER DENYING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT - 11

modify or decertify the class or divide it into subclasses. *See Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982); Fed. R. Civ. P. 23(c)(1)(c) & (c)(5).

### B.    Two Types of Damages: Incidental and Individual

The second issue arising from ¶ 3.12.3 is whether the future damages claims given up by inmates in the Settlement Agreement are *merely incidental* to injunctive relief. This issue usually arises in subsection (b)(2) class actions, but it seems relevant to any type of class that is certified for injunctive relief and not monetary damages, given the language in *Wal-Mart Stores*. Case law has made it clear that only monetary relief that is "incidental to requested injunctive or declaratory relief," may be included in a section (b)(2) class action certified for injunctive relief. *See Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 415 (5th Cir. 1998), cited in *Wal-Mart Stores,* 564 U.S. at 365–66. Incidental monetary relief means "damages that flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief." *Wal-Mart*, 564 U.S. at 366 (citing *Allison*, 151 F.3d at 415).

Incidental damages do not include individualized claims. *Id*. Incidental damages are recognizable as being claims that "should not require additional hearings to resolve the disparate merits of each individual's case; it should neither introduce new and substantial legal or factual issues, nor entail complex individualized determinations." *Id. See also Yarger v. ING Bank, fsb*, 285 F.R.D. 308, 320 (D. Del. 2012) ("The Proposed Class's claims for monetary damages are not incidental to injunctive relief [because] the damages will not flow to the class as a whole, but rather will go to individual class

members based on the amount that they overpaid in comparison to the amount advertised for Rate Renew.")

If the class waiver of future monetary damages is as narrow as the parties describe—that future suits for monetary damages are barred if an inmate claims *only that Defendants are complying with the Settlement Agreement but nevertheless should be required to do something more than that*, such a claim would be incidental. As the parties reasoned, why would Defendants agree with Plaintiffs to take a certain course of action as a jointly-determined remedy *and* simultaneously agree to be sued for taking that action?

Judging from the type of prisoner Eighth Amendment medical care complaints usually filed in federal court, the Court believes that most claims would *not* be of that nature. Most would assert that Defendants are *not* following the Settlement Agreement as they should, including claims that Defendants are wrongfully exercising their discretion to choose to withhold DAA treatment from a particular inmate. That type of lawsuit would seek individualized damages and would not be deemed "incidental." Therefore, any individualized claims are beyond the scope of the class certification and cannot be included in a class action certified for injunctive relief only.

It seems that if the Settlement Agreement provision were narrowed to better reflect that the class as a whole was barred from filing the type of claim the parties intend to bar—*suits alleging that Defendants are complying but should be required to do something different from or beyond the agreement*—it would fall under the "incidental

**ORDER DENYING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT - 13**

damages" exception that would fit within section (b)(2) in a future iteration of the parties' agreement.

If, on the other hand, the parties desire class members to give up rights to sue for future damages, then several issues need to be addressed. As explained above, opt-out notice must be given. As explained below, provision for treatment of inmates in low-risk HCV subcategories must be included in any settlement agreement, because the Settlement Agreement currently provides no or inadequate protection for this subcategory of inmates. The parties are encouraged to revisit the type of certification appropriate to this case. For the foregoing reasons, the Court cannot approve the Settlement Agreement.

As the parties consider a change of certification, they may want to consider that the Court widened the class to include inmates in the legal custody of the IDOC to address those housed in out-of-state prisons (to alleviate crowding in IDOC facilities), but the Court now questions whether the term "legal custody" can be read to also includes those persons on parole, who can presumably obtain treatment in the community, and should not be included as class members. The Settlement Agreement applies only to inmates "in custody." Dkt. 127-7, ¶ 1.5. Therefore, both the class certification and a future settlement agreement may need to be narrowed to clarify that persons on parole or probation are not class members and not subject to the Settlement Agreement.

Another subcategory for revision may be whether the class certification should be limited to *chronic* HCV sufferers. While the community standard of care suggests that

even acute sufferers should be treated with DAA drugs,[3] this subcategory of inmates

raises the issue of Eighth Amendment cost-as-a-legal-limitation-on- medical-care

question that need not be addressed here due to the age of this case and the narrowness of

the Settlement Agreement subject matter.[4] Other class actions cases pursued in other

---

[3] *See Holloway v. Corr. Med. Servs.*, No. 4:06CV1235 CDP, 2010 WL 908491, at *2 (E.D. Mo. Mar. 9, 2010) ("the 2003 Federal Bureau of Prison Guidelines for the Prevention and Treatment of Viral Hepatitis recommended that inmates 'diagnosed with acute hepatitis C ... be considered for antiviral therapy,' but cautioned that, because 'the timing and optimal treatment regimen ... are uncertain, ... treatment decisions should be made on a case-by-case basis'" (referring to Interferon treatment)). The 2018 FBOP guidelines include this language: "In most cases of acute HCV infection, treatment may be deferred to allow for spontaneous clearance of viremia. However, in some cases there may be a compelling reason to treat the acute infection in order to prevent severe complications, e.g., HCV infection superimposed on established cirrhosis or advanced fibrosis." The 2021 FBOP guidelines state: "All sentenced inmates with HCV infection (detectable HCV RNA) are eligible for consideration of treatment. The AASLD/IDSA guidance now recommends treatment for acute HCV infection, rather than monitoring for spontaneous resolution over 6–12 months." *See* Exhibit A.

[4] In *Crigger v. Wright*, No. 1:15CV713 (LMB/IDD), 2016 WL 1626580, at *1 (E.D. Va. Apr. 20, 2016), the court observed:

> No set of inmates has been successful in arguing that all inmates are entitled to all forms of treatment for HCV in prison. A system of prioritization for reasonable public funding has been upheld in those cases where it has been challenged.

In *Hoffer v. Secretary, Florida Department of Corrections*, 973 F.3d 1263 (11th Cir. 2020), the majority and dissenting opinions contain an excellent summary of the Eighth Amendment cost issue. The majority wrote:

> We agree with the Secretary that nothing … precludes prison authorities from "consider[ing] ... the cost of treatment in making medical decisions." Br. of Appellant at 16 (quotation omitted). Although we have never had occasion to say so expressly, other courts have recognized the commonsense notion that "the civilized minimum" level of care required by the Eighth Amendment "is a function both of objective need and cost." *Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999). Need and cost are correlated, such that the more serious and exigent an inmate's need, the more likely it is that "the civilized minimum" might be deemed to require expensive treatment—and vice versa. *See id.*

> * * *

jurisdictions have narrowed the class to inmates suffering from chronic HCV. *See, e.g.,*

*Hoffer v. Secretary, Florida Department of Corrections*, 973 F.3d 1263 (11th Cir. 2020);

*Postawko v. Missouri Dep't of Corr.*, No. 2:16-CV-04219-NKL, 2017 WL 3185155, at

*10 (W.D. Mo. July 26, 2017), *aff'd*, 910 F.3d 1030 (8th Cir. 2018) (class limited to only

those inmates with chronic HCV, not acute HCV).

---

> Every minute of every day, ordinary Americans forgo or delay beneficial—and even life-altering—medical treatment because it's just too expensive…. What a topsy-turvy world it would be if incarcerated inmates were somehow immune from that cold—and sometimes cruel— reality. *See Maggert v. Hanks*, 131 F.3d 670, 671 (7th Cir. 1997) ("A prison is not required by the Eighth Amendment to give a prisoner medical care that is as good as he would receive if he were a free person, let alone an affluent free person.").
>
> So, to be clear, the Eighth Amendment does not prohibit prison officials from considering cost in determining what type (or level) of medical care inmates should receive. Nor, correlatively, are cost considerations off-limits to reviewing courts charged with determining whether prison officials have acted in so reckless and conscience-shocking a manner as to violate the Constitution.
>
> Now, having said that, our cases do recognize an outer limit. While it is clear that cost can (and often will) be a relevant criterion in determining what the Eighth Amendment requires in a particular circumstance—what "minimally adequate care" entails in the first instance, *Harris [v. Thigpen]*, 941 F.2d [1495], 1509 [(11th Cir. 1991)]—it is also clear that cost can never be an absolute defense to what the Constitution otherwise requires. Put differently, if a particular course of treatment is indeed essential to "minimally adequate care," prison authorities can't plead poverty as an excuse for refusing to provide it. *See, e.g., Anderson v. City of Atlanta*, 778 F.2d 678, 688 n.14 (11th Cir. 1985) ("Lack of funds for facilities cannot justify an unconstitutional lack of competent medical care or treatment of inmates.").

*Id.* at 1276-77.

**ORDER DENYING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT - 16**

### 3. Fairness and Equity Relating to Class Members Who Have Chronic HCV in Low-Risk Subcategories

Searcy objected that the Settlement Agreement copy provided for class inspection did not contain the exhibits referenced in the Settlement Agreement, including the FBOP guidelines, and, thus, class members could not adequately analyze the fairness of the Settlement Agreement. While the Court disagrees that the notice was not adequate and concludes that class members could have obtained the FBOP guidelines as a matter of public record or from class counsel had they wanted to review them,[5] that objection nevertheless caused the Court to review the 2018 guidelines, and its research led it to the 2021 guidelines, which led to the following analysis.

The Settlement Agreement does not contain a clear provision to require the IDOC to treat class members who have chronic HCV but are classified in the lower risk subcategories in the event that funds remain available after treating the sickest inmates. The lower-risk subcategory encompasses the majority of HCV sufferers, according to the HCV log produced by the IDOC in 2016. The Court concludes that the Settlement Agreement is unfairly skewed toward the sickest HCV inmates, given that *no* clear provisions are included for low-risk HCV inmates, and that very sick inmates who come into the system are likely to jump ahead of low-risk sufferers in treatment priority. The

[5] The exhibits to the Settlement Agreement and the class counsels' contact information in the Settlement Agreement should be included in the notice to class members if the class certification remains under 23(b)(3). Failure to include these items in the first round is not grounds to disapprove the Settlement Agreement. "Rule 23(e) requires sufficient detail simply 'to alert those with adverse viewpoints to investigate and to come forward and be heard.'" *In re Online DVD-Rental Antitrust Litig*., 779 F.3d 934, 946–47 (9th Cir. 2015) (internal citation omitted). In that case, the court determined that the Constitution and Rule 23 did not require "the level of specificity" the objectors claimed was needed. *Id*.

ORDER DENYING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT - 17

plan set forth in the Settlement Agreement is to treat a certain number of the sickest patients first. If the required number of patients is treated and there is still money left in the annual fund, there is no provision requiring the IDOC to treat the other chronic HCV patients waiting in the queue—those who are in the lower risk subcategories—until the annual fund is exhausted. As to this subcategory of HCV sufferers, it is as if the old IDOC policy effectively remains in place—those inmates who are in the lower risk subcategories may never get treated unless their symptoms worsen. That means their bodies are permanently damaged, even though the new drugs that cure HCV and prevent bodily damage are available and even though funding set aside for treatment of chronic HCV may still be available.

Paragraph 3.6.8 seems to support an interpretation that the IDOC is under no obligation to treat any of the inmates except the sickest, citing the possibility that there may be "an insufficient number of inmates who are eligible to receive DAA treatment during FY 2024 or FY 2025." Dkt. 127-2, p. 13. While the Settlement Agreement sets aside several million dollars per year, it is to be used "exclusively for the purpose of providing DAA Treatment to *eligible* inmates with Chronic HCV." Dkt. 127-2, ¶ 3.6 (emphasis added) According to the 2021 community medical standards, *every* person with chronic HCV should be treated. The lack of provision or lack of clarity of provision for the low-risk class members who make up the majority of the class renders the Settlement Agreement unfair and inadequate as to them. *See Gordon v. Schilling*, 937 F.3d 348, 359 (4th Cir. 2019) ("it is inconsistent with the Eighth Amendment for a prison

official to withhold treatment from an inmate who suffers from a serious, chronic disease until the inmate's condition significantly deteriorates").

### 4. The Need to Update the Treatment Standards Throughout the Settlement Agreement

While the Settlement Agreement was awaiting class certification and final approval, not due to the fault of the parties, the community medical standards of care for HCV treatment of inmates changed. Because the Settlement Agreement uses the outdated standards of law as its baseline and methodology for new HCV protocol, the Court concludes that the Settlement Agreement is inadequate.

The following provisions are samples of the outdated standards:

- ¶ 3.3   "IDOC will also require the Contractor to evaluate, follow and treat inmates in a manner consistent with the current treatment recommendations established by the Federal Bureau of Prisons (FBOP) as may be deemed medically appropriate by the Contractor's health providers." The "current" FBOP guidelines (2021) have changed fairly dramatically from the 2018 guidelines. Primarily, there are no more "priority levels" in the 2021 guidelines. *See* Exhibit A, 2021 FBOP Clinical Guidance. Because ¶ 3.3 requires the Contractor to use "current" guidelines, while at the same time many other paragraphs of the Agreement are based on the old 2018 "priority levels," the Court finds that the Settlement Agreement is internally inconsistent to the degree that it would be unfair to require inmates to have to rely on an Agreement referencing outdated medical standards from now through July 2028.

ORDER DENYING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT - 19

- ¶ 3.4   If the IDOC is using the same "Hep C Log" criteria for urgent and regular treatment eligibility, it is out of date. It requires the reporting of priority level and most recent APRI or F-Score as the major indicator of which inmates should receive DAA treatment first. The 2021 FBOP guidelines recommend that practitioners review many more factors for a determination of who "may require more urgent consideration for treatment," based on "[c]ertain conditions [that] are at higher risk for complications or disease progression" including many of the factors on the "Hep C Log 5-24-16" but also other factors such as "Birth cohort 1945-1965." *See* Exhibit A, pp. 12-13 (emphasis in original). Because the "Priority 1, 2, 3" categories of the 2018 FBOP guidelines are now out of date, because the IDOC's used of "Priority 1, 2, 3, 4" of the *2016* FBOP guidelines in its Hep C Log may be doubly out of date, and because no priority levels at all are included in the 2021 guidelines, the Court concludes that if it approved this paragraph, it would be approving use of outdated guidelines for current and future treatment of inmates.

It would perhaps be more appropriate to use a new system of DAA treatment "prioritization" for the log, such as a composite score, for example, just to suggest a new acronym that need not be used, an "RLCDP score" (Risk Level for Complications or Disease Progression, a term used by the 2021 FBOP Guidelines), or by devising some other method for distilling the new 2021 factors of risk into a new prioritization system for the HCV log report. Perhaps that has already been done. As it stands, providing the log in the form set forth in ¶ 3.4 or

in a form substantially similar to the 2016 log proffered in Case 309, would not be of use to class counsel in their future monitoring to determine whether the IDOC eligibility and risk factor analyses comport with current (2021) FBOP guidelines.

- ¶ 3.5   The statements in this paragraph about who is eligible for HCV treatment are outdated. It states, "No inmate with Chronic HCV will be deemed ineligible to receive DAA Treatment based solely upon the inmate's fibrosis score and/or priority level." Current community medical standards of care state the opposite proposition and are broader: *all* persons with chronic HCV are *eligible* to receive DAA treatment. Using the IDOC's outdated standard of eligibility in this paragraph is not to the inmates' advantage, as it sets a tone for the Agreement that is not intended to benefit *all* chronic HCV inmates.

    The second sentence of ¶ 3.5 is also outdated: "*for those inmates with Chronic HCV who are eligible for DAA Treatment*, the limited available treatment resources will be prioritized among inmates based upon medical need as determined by medical judgment of the Contractor's health providers." Inmates seem to be giving up too much here by not insisting on the current community standard*: all persons with chronic HCV are eligible for DAA treatment*, and the limited available resources will be prioritized among inmates based upon medical need as determined by medical judgment of the Contractor's health providers. Whether all inmates with chronic HCV can receive treatment at public expense is a different topic, but the inmates are not required to accept a standard lower than the community standard as their standard of care from now until 2028, especially

because the standard of care has consistently gotten higher. The third sentence in this paragraph stating that treatment at IDOC facilities is to be "consistent" with the 2018 FBOP guidelines is outdated.

- ¶ 3.6   The IDOC has agreed to allocate a certain amount of funds (if it can be secured by the legislature each year) from now until 2028 "for the purpose of DAA Treatment to eligible inmates with Chronic HCV." The Court questions whether the minimum number of inmates helps or hinders the ability of lower risk level inmates to receive DAA treatment. A more sure benefit to the inmates might be derived from language that shows that the IDOC is required to spend the allocated money on all inmates with chronic HCV, beginning at the highest risk level and descending to the lower risk levels until the annual fund has been exhausted.[6] This means that if money is leftover and inmates with chronic HCV but no serious symptoms have not been treated, they will be treated to eradicate the disease before it progresses. Again, as explained above, this is not a matter of the Court's preference of two equally good ways to settle this dispute, but of whether the low-risk chronic HCV inmates (the bulk of the class) receive anything from the Settlement Agreement and whether the new protocol sounds different but

---

[6] Not all chronic HCV sufferers will be cleared and selected for treatment, *see* Exhibit A, 2021 FBOP Guidelines, but all are eligible and should considered. The Court does not make the distinction between *eligible* (meaning all chronic HCV sufferers should be considered and triaged or vetted but not all will be selected for treatment), and *potentially eligible* (which could be defined as all chronic HCV sufferers, with "eligible" then meaning only those selected for treatment). Future certification and settlement agreements should carefully define what is meant by "eligible."

**ORDER DENYING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT - 22**

is actually quite the same as the old policy to let HCV-positive inmates stagnate without treatment until they develop serious health problems.

- ¶ 3.6.8   This section is unclear: "Provided further, in FY 2021, FY 2022 and FY 2023, if IDOC Defendants fail to spend the amounts set forth herein by more than ten percent (10%) in any such fiscal year," that failure is considered a material breach. This apparently means that IDOC must spend 90% of the funds allocated. However, with no companion provision elsewhere in the agreement that the IDOC must treat those inmates (the majority of the class) in the lower-risk subcategories and no explanation why they should not be required to spend all of the funding (for example, if all of the chronic sufferers have been treated), this term is detrimental to that subcategory, given that all chronic sufferers are eligible for treatment under the FBOP Guidelines.

    This paragraph also states that in the years in which the IDOC need not treat any minimum number of inmates "due to an insufficient number of inmates who are eligible to receive DAA treatment," failure to treat a certain number shall not be deemed a material breach of contract. However, again, under current community standards, if the money is available for HCV treatment, then all of the triaged or vetted chronic (meaning those with an HCV-positive status for more than six months) cases should be treated; the fact that "eligibility" is defined elsewhere as something other than *simply the status of having chronic HCV and having been triaged or vetted* blocks a whole subcategory of the class from getting the benefit they sued for.

- ¶ 3.6.6   This paragraph continues the obligations of providing a fund for HCV treatment, with no specific amounts set forth and no specific number of inmates to be treated. It would seem fair for the Settlement Agreement to provide that an allocation will be made that is comparable to prior years and that any chronic HCV sufferers of any risk level will be eligible to receive treatment, and that the fund will not be significantly diminished unless the number of chronic HCV sufferers has also significantly diminished. For lower-risk inmates to give up the right to have treatment until July 2028, when the Settlement Agreement would permit them to bring another injunctive relief suit, arguing that as far back as 2021 the community standard of care was to treat every chronic sufferer, is unfair and does not eliminate the past practice of allowing HCV to destroy inmates' bodies before curative treatment is provided. This paragraph seems to add little to ensure that Plaintiffs' HCV will continue to be treated on a scope that will encompass the low-risk HCV sufferers. The Court also hesitates to approve such a vague "promise" for treatment levels to remain at consistently-high levels, given that, even in 2021, the community standard of care for DAA treatment of HCV included even acute HCV sufferers—which means that in 2026 to 2028, inmates with chronic HCV may be held to a very outdated standard of care.

**5.   Other Objections to the Settlement Agreement**

The following objections are not sufficient, in themselves, to deny the Settlement Agreement. However, the parties may want to address these issues in the next round of proceedings.

### A.      Objection as to Attorney Fees and Costs

Searcy objected to the attorney fee provision of the Settlement Agreement. The first question is whether the fee provision is fair. Section 3.8 provides: "In connection with this Agreement, the Parties agree that Class Counsel shall recover fair and reasonable attorney fees as determined by the Court from the common fund to be created by the expenditures required in Paragraphs 3.6.1 through 3.6.5 of this Agreement." Dkt. 127-2, p. 14. This provision gave class members notice that the source of "fair and reasonable attorney fees" is the common fund to be provided by IDOC. *Id*., p. 12. This provision also gave notice that the amount of attorney fees is to be determined on the "fair and reasonable" standard as determined by the Court. In many class action lawsuits, the parties have pre-determined the amount of fees. Here, both the parties and the class members have the added benefits of having the neutral and experienced court determine fees. This is a fair provision.

The second portion of the fee provision provides: "The Parties further agree that Class Counsel will recover their reasonable costs as of the date of the Effective Date of the Agreement and attorney fees of $100,00.00 on behalf of Defendants, paid by the Corizon Defendants due and payable within (30) days from the Effective Date of the Agreement." Dkt. 127-2, p. 14. This provision explains that the second set of Defendants,

the Corizon Defendants, agreed to provide $100,000 in attorney fees. When the provision is read carefully, the Court agrees with the parties that the provision states that counsel is recovering (1) their costs that accrued up to the effective date of the agreement, and (2) attorney fees of $100,000. At a first glance, the document seems to say that $100,000 was the amount of the attorney fees that accrued up to the effective date of the agreement, but a closer read shows that the phrase "as of the date of the Effective Date of the Agreement" modifies only the "reasonable costs" section. This provision fairly and reasonably permits counsel to obtain some amount of fees after having spent years of work on this case, at the time of settlement, without having to wait for the attorney fees briefing and decision of the Court.

The objector argues that the "fair and reasonable" attorney fees phrase equals an attorney fee free-for-all, and that the parties were obligated to be more specific in how much in attorney fees might be awarded to counsel. The objector is requesting more information than is required by the Constitution or Rule 23. The class had adequate notice that "fair and reasonable" attorney fees—to be determined under the federal Court's ancillary jurisdiction powers—would be sourced from the common fund established by the IDOC primarily to pay for inmates' Hep-C care.

Objectors further argue that, under the 25% "common fund" theory of calculation suggested by the parties, "fair and reasonable" fees might exceed $7,000,000, and that would not be "fair and reasonable" given the amount of work the attorneys performed (which presently is unknown to objectors) and the total amount of money in the fund. However, the parties did not specify that "fair and reasonable" fees must be determined

by the common fund theory. The parties left the theory of fee calculation to the Court. The parties are represented by experienced counsel and know the law on civil rights attorney fees.

Class members had all they needed in the Settlement Agreement to ascertain a summary of the attorney fees provision. They are hard-pressed to argue that the Court is unable to determine "fair and reasonable" fees in this case. The parties are free to argue that the "common fund" method would be appropriate here, as opposed to the usual lodestar (with or without enhancement) method typically applied in civil rights cases.[7]

The objector's objection as to the unfairness of the fee provision will be overruled.

### B.    Clarification as to Court of Enforcement vs. Ancillary Jurisdiction

The Settlement Agreement provides that "the Court" shall determine the attorney fees. Dkt. 127-2, ¶ 3.8. The term "the Court" usually refers to the federal district court. *See id.*, ¶ 1.8, the Agreement provides that "this Court's jurisdiction will end with the

---

[7] In *Morales Feliciano v. Hernandez Colon*, 697 F. Supp. 51, 56 (D.P.R. 1988), the Court explained:

> It is settled law that to calculate attorney's fees under section 1988 a two-step process must be followed. *Hensley v. Eckerhart*, 461 U.S. 424, 433–434, 103 S.Ct. 1933, 1939–1940, 76 L.Ed.2d 40 (1983). We first have to multiply hours reasonably expended by each prevailing attorney times a reasonable hourly rate, to arrive at the "lodestar" of a reasonable fee. This lodestar is "presumed to be the reasonable fee to which counsel is entitled." *Pennsylvania v. Delaware Valley Citizen's Council for Clean Air*, 478 U.S. 546, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986) (*Delaware Valley I* ). Then we may, in exceptional cases, make upward adjustments to the lodestar figure in light of various factors which are not accounted for in it, such as risk of nonpayment, delay in payment, and undesirability or importance of the case. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 107 S.Ct. 3078, 3081–3082, 97 L.Ed.2d 585 (1987) (*Delaware Valley II* ).

**ORDER DENYING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT - 27**

approval of this Agreement and any proceedings pertaining to enforcement of this Agreement shall occur in the Court of Enforcement." *Id.*, ¶ 2.5. The Agreement designates the state court as the Court of Enforcement, *Id.*, ¶ 1.9.

The parties have clarified that it intends for the federal Court to decide the attorney fees provision under its ancillary jurisdiction authority that attorney fees for crafting a settlement and monitoring the settlement are not to be interpreted as "enforcement" of the terms of the agreement. However, a clearer version of the attorney fees provision would be helpful.

### C.  Clarification as to Cross-Referencing of Remedies Terms within Settlement Agreement

Searcy noted that the Settlement Agreement contained a typographical error in the cross-referencing of the terms. The parties and their counsel present at the hearing agreed that paragraph 3.21.9, providing that "Remedies for any failure of approvals or appropriations shall be governed by paragraph 3.13 of this Agreement rather than this paragraph, 3.21, and its subparts," *should instead* reference paragraph 3.14, not 3.13, based on the content of each of those paragraphs. Dkt. 127-2, ¶ 3.21. The cross-reference can be corrected in a future agreement.

### D.  Objection that Plaintiffs Bargained Away Certain Rights on Behalf of Class

Searcy argues that the individual plaintiffs bargained away the right of class members to bring all of their monetary damages claims. That is incorrect. The class was created and authorized only for purposes of settlement of the injunctive relief claims. Prior to certification of the class, the individual plaintiffs were represented by the

attorneys who became class counsel. Prior to certification, the individual plaintiffs settled their own monetary damages claims against Defendants. Because there was no class, the individual plaintiffs could address only their own claims. The Settlement Agreement, the Class Action Notice, and this Court's Order made it abundantly clear that all inmates retain their right to file individual lawsuits to pursue monetary damages that arose "prior to the effective date of this Agreement," ¶ 3.12.3. This objection is a non-issue.

### E.   *Objection that the Settlement Agreement Provides No Remedy for Failed Approvals or Appropriations*

Searcy objects to the Settlement Agreement Provision that permits the Agreement to lapse if the legislature fails to approve the funds or the state government fails to properly appropriate the funds for inmate HCV use. This does not make the Agreement unfair or inadequate. The state legislature is not a party to this lawsuit. The objectors do not offer any suggestions as to how to force a state legislature to commit to certain funding years in advance.

If the legislature fails to provide for the funding, the defunct Settlement Agreement leaves the class members in the same position they would have been—free to pursue a mandatory injunction based on the new community standard of care. This provision is simply part of the give-and-take of negotiation.

### F.   *Objection to Allegedly Bargaining Away of State Statutory Attorney Fees Provision*

Searcy argues that the Settlement Agreement unfairly bargains away the ability of the class to seek statutorily-available attorney fees under Idaho Code § 12-120(3). There is no legal support for this assertion. To be a "commercial transaction" upon which a fee

award may be based, each party must be pursuing a commercial purpose, such as to earn money. For example, a party who entered into a contract to purchase tires for a personal vehicle did not fit into the category of a commercial transaction. *See Carrillo v. Boise Tire Co.,* 274 P.3d 1256, 1271 (2012); *Frontier Dev. Grp., LLC v. Caravella*, 338 P.3d 1193, 1203 (2014) (the Caravellas' purpose for entering into the agreement ... was to construct a house for their personal use; therefore the transaction was not commercial.") Here, Plaintiffs are attempting to obtain personal medical care; they have no commercial purpose. This objection is a nonissue.

### G.     Adequacy of Class Representative

It is unclear whether the current class representative has been treated with DAA medication and has been cured of HCV. If that is the case, it may be helpful to add a representative who is in the lower-risk subcategories.

## CONCLUSION

The Court was initially very hopeful that it could approve the Settlement Agreement. However, the deeper the Court dug into the terms of the Settlement Agreement—enlightened by having to search for the 2018 FBOP guidelines that were not attached to the Agreement and by further research into the 2021 new and very different set of FBOP guidelines reflecting a new community standard—the more it has become apparent that certain portions of the agreement are outdated. In addition, upon further reflection as to the terms, the Court finds that the Settlement Agreement contains some unfair terms that have the appearance of preferential treatment as between members of

**ORDER DENYING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT - 30**

the class who are very sick and those who are not— even though *all* of them need DAA treatment.

The parties are free to return to mediation and revise their agreement or proceed to litigation. The Court acknowledges that some of the problematic parts of the Settlement Agreement could not have been anticipated by the parties, such as a substantially different FBOP standard of treatment. However, as several generations of *Balla* settlement agreements have shown, far-reaching agreements that both mandate and prohibit action—especially those that relate to the delicate issue of delivering medical treatment to prisoners—must be based on present prison-wide facts and present law, not agreements based on old standards that have limited applicability and vitality.

## ORDER

**IT IS ORDERED:**

1. The class members' objections are SUSTAINED in part and OVERRULED in part, as set forth above.

2. The Joint Motion for Approval of the Settlement Agreement (Dkt. 152) is DENIED. Within 30 days after entry of this Order, the parties shall notify the Court of their intentions and suggest an appropriate timeline for how they intend to proceed.

3. Hereafter, the parties shall use the new caption set forth above in this case.

4.  The "Motion to Join as Co-Plaintiff" filed by Matthew Stonecipher (Dkt. 166) is

    DENIED as moot. All IDOC inmates are already members of the class. The

    motion specifies that it is not an objection to settlement.



DATED: September 29, 2022

B. Lynn Winmill
U.S. District Court Judge