Richard A. Hearn (ISB No. 5574)
John B Ingelstrom (ISB No. 2659)
HEARN LAW, PLC
151 N. 3RD Avenue, Suite 100
Pocatello ID 83201
Telephone: 208-904-0004
FAX: 208-904-1816
Email: hearn@hearnlawyers.com
jbi@hearnlawers.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| REUBEN J. CORTES, PETE KIMBALL ROBERTS, et al., | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:18-cv-00001-BLW |
| vs. | ) ) | **CLASS COUNSEL'S PETITION FOR FAIR AND REASONABLE** |
| JOSH TEWALT, et al., | ) ) | **ATTORNEYS FEES AND COSTS** |
| Defendants. | ) ) | |

COMES NOW Class Counsel and, pursuant to the Amended Private Settlement Agreement and Release (Dkt. 170-1) (the "Agreement") and the Order of Approval of Amended Settlement Agreement (Dkt. 186), petitions the Court to determine that Class Counsel's request herein for attorney fees and costs is fair and reasonable as follows:[1]

1.  At all times pertinent, it was the intent of the parties, and they so agreed, that Class Counsel's fair and reasonable attorney fees would be determined under "common fund"

---

[1] With court staff's approval, the parties have stipulated to an extension of time for the filing of this pet ition.

analysis utilizing the percentage-of-recovery method. IDOC did not and would not agree to seek legislative appropriations beyond those considerable amounts specified in ¶ 3.6 of the Agreement that it committed to expend for the benefit of the entire class. Accordingly, the agreement provides that the Defendants deny any violation of law, liability or wrongdoing (¶ 2.3), and the parties expressly agreed that "no Party is a prevailing Party in this Action with regard to an award of attorney fees…" (¶ 3.15). These two provisions of the Agreement remove the common predicates for an award of fees under a fee-shifting analysis (lodestar).

2.  In February, 2021, as the parties were in the process of confirming client approval and finalizing the settlement and release documents for a tentative global settlement of all the claims in the action (See Dkt. 122), IDOC's representatives expressed a concern about the prospects of Class Counsel seeking a percentage recovery from the fund at or near the Ninth Circuit's benchmark of 25 percent. Class Counsel was requested to provide a range of percentages it was contemplating at that time. Although Class Counsel had not at that time completed an assessment of the percentage range for which it may seek the Court's approval, Class Counsel responded by indicating that it was considering up to 6% of the fund, and IDOC's counsel were reassured by that response. Of course, several years have passed since then and Class Counsel expended considerably more time and effort on behalf of the class, even including the on-going litigation before the Texas Bankruptcy Court. More importantly, however, is that the scope and extent of the relief recovered for the class as a result has been appreciably increased.

3. Finally, in connection with the Court's Order of Approval of Amended Settlement Agreement (Dkt. 186), Class Counsel and counsel for the IDOC Defendants have conferred which has resulted in the Stipulation which is submitted herewith in support of this Petition as Exhibit 1. While covering several issues discussed below, significant here is the reaffirmation of the parties' earlier agreements (including the Agreement) that Class Counsel's common fund recovery of attorney fees would be calculated on a percentage-of-recovery basis (Exhibit 1, ¶ 1).

4. District courts in the Ninth Circuit generally have discretion in common fund cases to choose either the percentage-of-the-fund or the lodestar method. *Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1047 (9th Cir. 2002).* Class Counsel respectfully submits that general rule may not be applicable in this case. As this Court observed in the Order of Approval (Dkt. 186), "the parties have specifically agreed that the Amended Agreement constitutes a private settlement agreement and not a consent decree, as follows:

> WHEREAS, the Parties reached the terms set forth below expressly based upon the agreement that this Agreement shall be deemed a private settlement agreement in accordance with 18 U.S.C. § 3626(c)(2) and not a consent decree, consent judgment, or other agreement whereby the Court retains jurisdiction to interpret, modify, or enforce the Agreement…."

(*Dkt.186 at 25.*) In *Officers for Justice v. Civ. Serv. Comm'n of City & Cty. of San Francisco, 688 F.2d 615 (9th Cir. 1982),* the Court noted that district courts cannot "delete, modify or substitute certain provisions." *Id. at 630.* Additionally, the Agreement further provides:

> The Parties do not consent to the Court modifying any final terms of this Agreement subsequent to Final Approval. In the event the Court, after Final Approval, modifies any express term or condition, or enters any order that materially alters the final terms of this Agreement, then at the discretion of either party, the Agreement shall be rendered null and void;

in that event, the Plaintiffs will be entitled to reinstate the Action or may elect to have the Parties return to the mediation process, and then reinstate the Action if mediation is unsuccessful. (Agreement, ¶ 3.10.4.)

5.   The Agreement provides that Corizon, LLC is obligated to pay the first $100,000.00 in attorney fees, due and payable within 30-days from the date of final approval by the Court. (¶¶ 3.8 and 1.13). However, prior to this Court's final approval of the Agreement, Corizon (as a predecessor or affiliate of Tehum) filed a Chapter 11 Bankruptcy Petition in the Southern District of Texas, staying resolution of this case and the <u>enforceability</u> of the Agreement. (See, Dkt.186, pp 3-5). Lacking the necessary expertise in bankruptcy law and procedure, Class Counsel associated with a bankruptcy specialist, Daniel C. Green of the Racine firm in Pocatello, Idaho. As a result of actions in the Bankruptcy Court, on October 2, 2023, that court ordered a limited modification of the automatic stay to allow this Court to approve or deny the Amended Settlement Agreement, and for Class Counsel to petition for and this Court to determine whether that amount is fair and reasonable. The Bankruptcy Court Order further provided that no amount above $127,421.22 ($100,000.00 of which was agreed to as attorney fees) could be asserted against the Debtor, and that Class Counsel would have to assert its claim for fees and costs of $127,421.22 through a proof of claim in the Chapter 11 case (See, Dkt. 184 and Dkt. 186, pp 3-5). A proof of claim for the specified $127,421.22 has been filed and is pending in the Bankruptcy Court. Whether some or any of that claim is paid remains unknown at this time. Nevertheless, Class Counsel is crediting the full $100,000.00 owed by Corizon against its fee request herein, and including Mr. Green's billed time of 130.9 hours within its common fund fee request. It should be

noted that the $100,000.00 credit actually translates into a smaller percentage recovery than the 7% requested here.

6.  By this application Class Counsel seeks this Court's determination that 7% of the $29.25 million common fund, less Corizon's $100,000.00 obligation, is a fair and reasonable attorney fee given the facts and circumstances of this lengthy litigation. The calculation is $29.25 x .07 - $100,000.00 = $1,947,500.00. Class Counsel submits that this requested fee is entirely consistent with both common fund and lodestar principles. Importantly, the financial recovery by the class is actually greater than $29.25 million because the level of funding in the last three years covered by the Agreement is not specified. (See Paragraph 3.6.6). Next, it is certainly doubtful that the 7% requested herein is anywhere near sufficient to entice competent plaintiffs' attorneys to undertake a large and complex civil rights case, whether or not on behalf of prisoners and whether or not as a class action. Similarly, a contingency fee of only 7% in any kind of plaintiff's case would be universally rejected by all competent plaintiffs' lawyers. Class Counsel, two small town country lawyers, have been litigating this case for six years now. Every step along the way has been entirely adversarial in nature, and often quite contentious. Substantial support for this 7% request is set forth in the parties' Stipulation submitted herewith. Significantly, and with the knowledge of Class Counsel's fee request herein, IDOC represents it has the current funds available this year to pay attorney fees to date **without affecting the DAA treatment of inmates required by the Agreement** (Exhibit 1, Stipulation ¶¶ 2 and 3). Therefore, the Court's approval of Class Counsel's fee request comes at no expense to the class and will not diminish the class's recovery of the relief provided by the Agreement.

7. In *Etter v. Thetford Corp.*, the District Court, citing *Vizcaino v. Microsoft Corp.*, identified the five factors useful to determine the reasonableness of a requested fee award in common fund cases.

> ***Rule 23*** **authorizes a court to award "reasonable attorneys' fees . . . that are authorized by law or by the parties' agreement."** *Fed. R. Civ. P. 23(h).* "[C]ourts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *In re Bluetooth Headset Prods.*, 654 F.3d at 941. **In the Ninth Circuit, the benchmark for a fee award in common fund cases is twenty-five percent of the recovery obtained.** *See id.* at 942. **Courts must "justify any increase or decrease from this amount based on circumstances in the record."** *Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443, 455 (E.D. Cal. 2013) (*citing Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990)). **The Ninth Circuit has identified a number of factors the Court may consider in assessing whether an award is reasonable, including: (1) the results achieved, (2) the risk of litigation, (3) the skill required and quality of work, (4) the contingent nature of the fee and the financial burden carried by the plaintiffs, and (5) the awards made in similar cases.** *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048-50 (9th Cir. 2002).[2]

8. When evaluated under these factors, a fee award of only *seven percent* of the common fund of $29,250,000 created pursuant to Paragraph 3.8 of the Amended Private Settlement Agreement and Release **is fair and reasonable**.

9. Results Achieved. In addition to the $29.25 million required to be spent by IDOC for the treatment of inmates in FY 2021 through FY 2025, IDOC also agreed to continue to treat inmates in FY 2026, 2027 and FY 2028. Altogether, the Amended Settlement Agreement requires IDOC to provide adequate treatment to all infected inmates in its facilities for 8 years beginning in FY 2021. Therefore, the benefit to be bestowed on the class over the eight years covered by the Amended Settlement Agreement will

---

[2] *Etter v. Thetford Corp.*, 2016 U.S. Dist. LEXIS 203655 *58-59; 2016 WL 11745096 (C.D. Cal. October 24, 2016) (*emphasis added*).

necessarily greatly exceed IDOC's required expenditures of $29.25 million over only the first five years.

10. To ensure that all infected inmates are detected so they can receive appropriate treatment, IDOC also agreed to perform "opt-out" testing rather than continue "opt-in" testing as was previously being done. "Opt-out" testing means that all inmates will be tested for HCV unless they explicitly ask not to be tested.

11. Because IDOC voluntarily agreed to start abiding by the terms of the Agreement prior to its final approval, preliminary data demonstrates the early results. (See Dkt. 170, pp. 3-5 and Hep C Table attached thereto; also see Dkt. 186, pp.13-14). Submitted herewith as Exhibit 2 is updated treatment data for 2023 and the first two months of 2024 emailed from Mr. Kraft on May 9, 2024. According to data provided to Class Counsel by IDOC:

   a. The average number of inmates per calendar year awaiting treatment has rapidly decreased from <u>573</u> in 2019, to <u>414</u> in 2020, to <u>255</u> in 2021, to <u>158</u> as of September of 2022 and to <u>65</u> in 2023.

   b. The average number of inmates treated per calendar year has increased from <u>101</u> in 2019, to <u>120</u> in 2020, to <u>269</u> in 2021, to <u>301</u> in 2022, to <u>478</u> in 2023.

   c. As of September 2022, IDOC treated <u>555</u> inmates in FY21, FY22 and FY23 (first 3 months in FY 2023 only) at a cost of <u>$11,124,788.96</u>.

   d. As of December 31, 2023, there were only 65 inmates awaiting treatment.

e.  Of these 65, 45 were in the lowest treatment priority (P3), 15 were in the next highest priority (P2) and only 5 were in the highest priority (P1).

f.  On average in 2023, 113 inmates per month tested positive.

As shown above, there has been an approximate fourfold increase in the number of inmates treated per year since IDOC voluntarily began to comply with the Agreement. The number of inmates awaiting treatment has decreased from 573 in 2019 to only 65 in 2023.

12. The Risk of Litigation. The risk of losing associated with representing incarcerated men and women seeking treatment for HCV costing tens of thousands of dollars – as much as $100,000 per inmate when the lawsuit was initially filed -- in a class action lawsuit against the Idaho Department of Corrections Defendants and Corizon was high. The fact that the virus is transmitted by intravenous drug use, illicit tattooing and gay sex even increased the risk of pursuing this case.

13. The Skill Required and Quality of Work. The case required specialized knowledge and experience in three different areas: (1) prisoner civil rights litigation; (2) class action lawsuits against the state; and (3) medical knowledge pertaining to HCV and its evolving treatment.  Class Counsel had previously successfully handled prisoner civil rights and class action cases. Class Counsel also included a licensed physician in Idaho who was Board Certified in Internal Medicine.

14. The Contingent Nature of the Fee and the Financial Burden Carried by the Plaintiffs. It should go without saying that counsel was representing neither the named Plaintiffs nor class members on an hourly basis. Recovery of fees in this case – as in all prisoner

cases – was contingent upon achieving success. Class Counsel here were two of the three lawyers in a small law firm, located in southeast Idaho. In hindsight, this small firm was not prepared financially to handle a class action prisoner civil rights case against Defendants IDOC and Corizon which has now lasted more than six years. As a result, the firm turned away multiple other potentially viable personal injury cases and has been required to turn to personal loans to survive. To continue in operation, the firm has also begun to accept appointment as public defenders in criminal cases in both State and Federal Court.

15. The Awards Made in Similar Cases. Class Counsel has identified three "similar" federal class action cases brought against jails or prisons for alleged civil rights violations. While each has significant differences from the instant case, the district court approved a fee award from a common fund in each of the three cases. The district court awarded class counsel $800,000 (36%) of the common fund of $2,220,000 in *In re Texas Prison Litigation*, 191 F.R.D. 164; 2000 U.S. Dist. LEXIS 5322 (W.D. Mo. 2000)(justified by the considerable time and labor expended, novel and difficult legal questions, the preclusion of other employment, the contingent nature of the fee, representation of prisoners(one of the least popular groups of clients), and that but for the skillful work of the dedicated lawyers the likelihood that only a handful of inmates would have received any of the relief.) The district court awarded class counsel $2,000,000 in fees (28.5%) of the settlement fund in *Lopez v. Youngblood*, 2011 U.S. Dist. LEXIS 99289; 2011 WL 10483569 (E.D. Cal. September 2, 2011) (finding counsel obtained excellent result in a complex and risky case, that tens of thousands of future inmates will benefit from the policy changes, and that the benefits created supports an award to incentivize

the undertaking of future complex and risky litigation); and the district court awarded

class counsel one-third (33.3%) of the common fund of $32,500,000 in *Kim Young v.*

*Cty. of Cook*, 2017 U.S. Dist. LEXIS 152466; 2017 WL 4164238 (N.D. Ill. September

20, 2017) (determining that a one-third contingent fee of the total recovery is on the

low end of what is typically negotiated by plaintiffs' firms taking on large complex

cases, and that a lodestar cross-check was not necessary.)

16. Class Counsel acknowledges that a less exhaustive lodestar cross-check may be used

as a point of comparison for determining the fairness and reasonableness of a

percentage-of-the-fund fee request.

> **Where a lodestar is merely being used as a cross-check, the court "may use a 'rough calculation of the lodestar.'"** *Bond v. Ferguson Enters., Inc., No. 1:09—cv—1662 OWW MJS*, 2011 U.S. Dist. LEXIS 70390, 2011 WL 2648879, at \*12 (E.D. Cal. June 30, 2011) (*quoting Fernandez v. Victoria Secret Stores, LLC*, No. CV 06-04149 MMM (SHx), 2008 U.S. Dist. LEXIS 123546, 2008 WL 8150856 (C.D. Cal. July 21, 2008)). **The court typically applies a lodestar multiplier after multiplying a reasonable hourly rate by the number of hours worked. "Multipliers in the 3-4 range are common in lodestar awards for lengthy and complex class action litigation."** *Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 298 (N.D. Cal. 1995) (*citing Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 549 (S.D. Fla. 1988)); *see also 4 Newberg on Class Actions § 14.7* (courts typically approve percentage awards based on lodestar cross-checks of 1.9 to 5.1 or even higher, and "the multiplier of 1.9 is comparable to multipliers used by the courts").[3]

17. Because the lodestar cross-check is only used as a point of comparison for determining

the reasonableness of a common fund percentage award, this cross-check need not be

as exhaustive as a pure lodestar calculation.

> **In any event, "[t]he lodestar 'cross-check' need not be as exhaustive as a pure lodestar calculation" because it only "serves as a point of**

---

[3] *Amador v. City of Ceres*, 2019 U.S. Dist. LEXIS 30577 \*17; 2019 WL 935496 (E.D. Cal. February 26, 2019 (*emphasis added*)

**comparison by which to assess the reasonableness of a percentage award."** *Fernandez v. Victoria Secret Stores, LLC, No. CV 06-04149 MMM (SHx)*, 2008 U.S. Dist. LEXIS 123546, 2008 WL 8150856, at *14 (C.D. Cal. July 21, 2008). "As a result, the lodestar can be approximate and still serve its purpose." *Id.[4]*

18. Class Counsel submits that such a cross-check supports this Court's determination that the 7% fee request herein is fair and reasonable. Accordingly, submitted herewith are the itemizations of the amount of time expended and services performed by the three attorneys who have worked in this case: Richard A. Hearn (RAH) and John B. Ingelstrom (JBI) of Hearn Law, PLC, (Exhibit 3) and Daniel C Green (DCG) – bankruptcy attorney of Racine Olson, PLLP. (Exhibit 4). Their total hours for past legal services rendered are as follows:[5]

RAH:       1459.6 hours

JBI:        1536.8 hours

DCG:       130.9 hours

Total:      3127.3 Hours

Future attorney fees, paralegal fees and costs for compliance monitoring is discussed below. Future attorney fees, paralegal fees, and costs and past paralegal fees have not been included in the lodestar cross-check.

19. In *Edmo v. Idaho Dep't of Corr., 2022 U.S. Dist. Lexis 207537 (D. Idaho, 2022)*, this Court found the customary rates for comparable civil litigators in the Boise area range between $400 and $485 per hour:

Ms. Edmo's local counsel—Ms. Ferguson and Mr. Durham—charge regular hourly rates of $475 and $400 per hour, respectively. *Ferguson Aff. ¶ 36,*

---

[4] *Bravo v. Gale Triangle, Inc.*, 2017 U.S. Dist. LEXIS 77714 **55-56; 2017 WL 708766 (C.D. Cal. February 16, 2017) (*emphasis added*).

[5] Class Counsel has not included its time for the preparation of this Petition.

> Dkt. 315-5. According to Howard Belodoff, an experienced Idaho civil rights lawyer, those rates are "in line with or below the market rates charged by other attorneys in the Boise area." *Belodoff Aff. ¶ 16*, Dkt. 315-8. Mr. Belodoff, who himself litigates prisoner civil rights cases, further attests that (1) his own hourly rate is $475 per hour, (2) two Holland & Hart attorneys with less experience than local counsel charge $400 and $485 per hour, and (3) Ms. Ferguson's and Mr. Durham's "excellent reputation[s], background, and experience" support their regular hourly rates. Id. at ¶ 12. The Court credits these declarations and finds that customary rates for comparable civil litigators in the Boise area range between $400 and $485 per hour.

*Id.at 30-31*. Class Counsel is reluctant to suggest it is entitled to the very highest rate within that range, but conversely and as a result of their combined experience of litigating civil cases for over 71 years, Class Counsel submits it is not at the bottom of that range either.

20. Mr. Ingelstrom's practice has been almost exclusively as a civil case litigator over a broad spectrum of subject matters (including personal injury, medical malpractice, civil rights and products liability) since joining the Racine firm in Pocatello, Idaho in 1982, after serving for two (2) years as a law clerk for the late Honorable J. Blaine Anderson, Circuit Judge in the United States Court of Appeals for the Ninth Circuit. He has represented both plaintiffs and defendants in the trial and appellate courts of the State of Idaho, the United States District Court for the District of Idaho, the United States Court of Appeals for the Ninth Circuit, The United States Claims Court (now the United States Court of Federal Claims), and various state and federal administrative agencies.

21. Mr. Hearn graduated *magnum cum laude* from Georgetown Law in 1991. Prior to going to law school, Mr. Hearn was a practicing physician in Georgia specializing in Internal Medicine, Rheumatology and Nephrology. Mr. Hearn practiced both law at Racine Olson and medicine for many years in southeast Idaho. Mr. Hearn left Racine Olson and started

his own firm approximately 8 years ago. Prior to moving to Idaho and joining Racine Olson, Mr. Hearn practiced for two years with Proskauer Rose in Washington D.C.

Mr. Hearn is currently admitted to practice before all Idaho State courts, the District Court for the District of Idaho and the Court of Appeals for the Ninth Circuit. His practice has primarily been in the areas of personal injury, civil rights and class actions with an emphasis in criminal defense recently. Mr. Hearn is representing Plaintiff Rossow in a *Rule 23(b)(2)* class action case against the Idaho Department of Health & Welfare currently pending before this Court.

22. Class Counsel is familiar with the bankruptcy expertise of Mr. Daniel C. Green by reason of their many years together at the Racine firm. He is widely recognized as one of the best bankruptcy lawyers in Idaho.[6]

23. For purposes of a lodestar cross-check, the following is an illustration of the adjusted lodestar figure based upon a low-end multiplier of 2 and 2.5, a total of 3,127.3 hours and four selected rates within the customary range identified in *Edmo* back in 2022:

| Hours | 3,127.3 | 3,127.3 | 3,127.3 | 3,127.3 |
|---|---|---|---|---|
| Rate | $400 | $425 | $450 | $485 |
| Multiplier | 2.0 | 2.0 | 2.0 | 2.0 |
| Adjusted Lodestar | $2,501,840 | $2,658,205 | $2,814,570 | $3,033,481 |
| Multiplier | 2.5 | 2.5 | 2.5 | 2.5 |
| Adjusted Lodestar | $3,127,300 | $3,322,736.25 | $3,518,212.5 | $3,791,851.25 |

24. In connection with this lodestar cross-check, Class Counsel contends that a lodestar enhancement using a multiplier of at least 2 is appropriate. *Vizcaino, supra. 290 F.3d at 1051; Kerr v. Screen Actors Guild, Inc., 526 F.2d 67, 69-70 (9th Cir. 1975); Edmo,*

---

[6] Submitted herewith as Exhibit 5 is the résumé/cv that Daniel C. Green has provided to Class Counsel.

*supra.*, 2022 U.S. Dist. Lexis 207537 at 6-7, 28-35; *Balla v. Idaho State Bd. Of Corr.,*

*2016 U.S. Dist. Lexis 188836 at 28-39.* As shown in the chart above, a fee of anywhere

between $2,501,840 and $3,791,851.25 paid from the common fund would be fair and

reasonable.

25. In this Court's recent decision in *Edmo*, the Court reiterated that the second step in the

lodestar methodology is to consider an adjustment (or multiplier) to the initial lodestar

calculation (hours x rate) based on the *Kerr* factors "that are not already subsumed in

the initial lodestar calculation*." Edmo, supra*. at 6 (quoting *Morales v. City of San*

*Rafael,* 96 F.3d 359, 363-64 (9th Cir. 1996).

26. Perhaps more relevant to the instant case is this Court's decision in *Balla, supra*. In

addition to determining that the PLRA rate undervalued counsel and the excellent

results obtained justified an adjustment (multiplier), this Court also found that an

adjustment was appropriate in light of the risks involved in taking contingent civil

rights cases and the need to incentivize other counsel to take similar cases:

> This type of enhancement is appropriate if "two prerequisites" are met: "First, . . . without an adjustment for risk the prevailing party would have faced substantial difficulties in finding counsel in the local or other relevant market," and, "[s]econd, any enhancement for contingency must reflect the difference in market treatment of contingent fee cases as a class, rather than . . . the riskiness of any particular cases." *Id.* (*quoting Fadhl v. City and County of San Francisco*, 859 F.2d 649, 650 (9th Cir. 1988)) (internal citations and quotation marks omitted).

> The Court finds Plaintiffs are deserving of an enhancement under this theory. Plaintiffs' counsel submits declarations making clear that prisoners who seek counsel for injunctive relief lawsuits face significant difficulty in finding such counsel. *See Gomez v. Gates*, 804 F. Supp. 69, 78 (C.D. Cal. 1992). Mr. Beladoff's declaration speaks directly to this issue:

> From my experience in representing prison and jail inmates throughout my career, including against the Idaho Department of Corrections, I know that prisoner cases are time-consuming and difficult, the hourly rates are limited by the PLRA, the financial ability of the defendants to mount a defense and litigate the case is far greater than the plaintiffs, and there is a lack of funds to cover the costs of diligent and effective representation, discovery and experts witnesses. I know of no private attorneys in Boise who in my opinion would have been willing to pursue a class action prisoner case over an extended

> period of time because they are undesirable and a financial hardship . .
> . . Most Idaho attorneys and law firms are simply unwilling to undertake
> a contingency fee case because of the commitment of time and outlay
> of expenses that is necessary to represent a class of prisoners in a case
> seeking only injunctive and declaratory relief.

*Beladoff Decl*. ¶¶ 14-15. Similarly, Mr. Sinclair expressed he would "strongly advise" against his firm undertaking such a case. *Sinclair Decl.* ¶ 13.[7]

27. Similarly, in *Vizcaino, supra*., where the appellate court affirmed the district court's

use of a 3.65 multiplier in the lodestar cross-check, the court observed as follows:

> Indeed, "courts have routinely enhanced the lodestar to reflect [] the risk of
> non-payment in common fund cases." This mirrors the established practice
> in the private legal market of rewarding attorneys for taking the risk of
> nonpayment by paying them a premium over their normal hourly rates for
> winning contingency cases. In common fund cases, "attorneys whose
> compensation depends on their winning the case [] must make up in
> compensation in the cases they win for the lack of compensation in the cases
> they lose." Class counsel here have represented that they would not have
> taken this case other than on a contingency basis. They perform little work
> on an hourly basis, and the rates they submitted were what they took to be
> market rates, in other words, rates that did not already reflect an expectation
> of excellent results."[8]

28. The Agreement also provides that Class Counsel will recover their reasonable costs as

of the date of this Court's Final Approval. (¶ 3.8). As is reflected in the statement of

costs submitted herewith as Exhibit 6, those outstanding costs as of that date are

$38,703.69. However, as with the fees, Corizon was obligated to pay the first

$27,421.22. As stated above, a proof of loss has been filed in the Bankruptcy

proceeding which includes this cost amount. The claim remains pending and recovery

of any of that claim is uncertain. Nevertheless, Class Counsel is crediting the full

$27,421.22, leaving a remainder of $11,282.47. However, pursuant to the parties'

---

[7] *Balla v. Idaho State Bd. of Corr.*, 2016 U.S. Dist. LEXIS 188836 **37-38; 2016 WL 6762651
(D. Idaho February 1, 2016).
[8] *Vizcaino, supra*., 290 F.3d at 1051 (internal quotations and citations omitted).

CLASS COUNSEL'S PETITION FOR FAIR AND REASONABLE ATTORNEY FEES AND COSTS    15

Stipulation, Class Counsel has agreed that if its 7% fee request is determined by the Court to be fair and reasonable, then the remaining cost balance will be treated as included in that fee payment. Otherwise, Class Counsel is seeking recovery of the remaining balance as a separate item payable from the common fund. (Exhibit 1, ¶ 4)

29. The Agreement obligates Class Counsel to monitor future compliance during the term of the Agreement ending on June 30, 2028. (Agreement, ¶¶ 3.4, 3.6, 3.21 and 3.22). The parties have stipulated to a mechanism for the submission and payment of fees and costs associated with future compliance monitoring. First, the parties have agreed that such fees will be based upon hourly rates of $300 for attorneys and $100 for paralegals. (Exhibit 1, ¶ 5). Second, fees and costs will be billed to IDOC by the 15th day of the month following their incurrence and paid by IDOC within 30 days after receipt of the billing invoice. If attorney fees for compliance monitoring activities exceed 5% of the budgeted treatment amount in any fiscal year, no further legal work will be undertaken until the parties meet and confer. (Exhibit 1, ¶ 6) Next, the parties have agreed that any disputes as to any such item of fees or costs billed which the parties are unable to resolve between themselves within the 30-day payment period, will be referred for resolution by an independent, neutral third-party selected by both parties. (Exhibit 1, ¶ 7). Finally, the parties agreed that if the 7% fee application is approved then the fees and costs will be treated as covered by that fee payment through the end of fiscal year 2025 (the final year for which expenditures are specified in the Agreement and which constitute the "common fund"). The above-described billing and payment procedure would begin than in fiscal year 2026 through the term of the Agreement. However, if the Court does not approve the 7% request, then the billing and payment procedure will

commence on the date of the Court's determination on the fee application and continue through the term of the Agreement. (Exhibit 1, ¶ 8).

Based upon the record in this case, as well as the authorities, facts and circumstances discussed above in this Petition, Class Counsel respectfully requests this Court to find the 7% fee request to be fair and reasonable.


DATED: this 9TH day of JULY 2024.


_/s/ *Richard A. Hearn*__
RICHARD A. HEARN
Attorney for Plaintiffs

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 9TH day of JULY 2024, I filed the foregoing electronically through the CM/ECF system which cause the following parties or counsel to be served by electronic means, as more fully reflected in the Notice of Electronic Filing:

STEVEN KRAFT
Moore, Elia, Kraft & Hall, LLP
PO Box 6756
Boise ID 83702

  /s/ *Richard A. Hearn*
RICHARD A. HEARN
HEARN LAW, PLC